Entered: September 29th, 2021
Signed: September 29th, 2021



**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at GREENBELT

| | | |
|---|---|---|
| In re: | * | Case No.   19-19515-TJC |
| Amadues Development, LLC | * | Chapter    11 |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| Yanfei Li, *et al.* | * | |
| Movant | * | |
| vs. | * | Proof of Claim No. 10 |
| Yanping Wang | * | |
| Respondent | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OF DECISION

Claimant Yanping Wang asserts a $277,899 secured and an $121,446 unsecured claim for prepetition loans made to debtor Amadues Development LLC (the "Debtor").  The loans were made through Jian "Victor" Liu ("Liu"), Ms. Wang's husband and a managing member of the Debtor.  Yanfei Li, Yue Wang, Jingjing Ye, Xiaoyu Su, and Yufeng Zhao (together, the "Owner Group") object to the claims.  ECF 20.  Before the court are the parties' cross-motions for summary judgment.  ECF 179, 182.  For the reasons that follow, the Court will disallow the secured claim and will leave for further proceedings the resolution of the unsecured claim.

1

## Jurisdiction and Venue

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1334 and 157(a) and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).  Venue is proper before this Court under 28 U.S.C. §§1408 and 1409.

## Statement of Material Facts Not In Dispute

### *The Debtor's Formation and Business*

1. The Debtor is a Maryland limited liability company that was organized to develop lots of real property in Potomac, Maryland.  It filed for Chapter 11 relief on July 15, 2019.  Almost immediately, the Owner Group filed a motion to convert or dismiss the case as an unauthorized filing, or in the alternative, for the appointment of a Chapter 11 trustee.  ECF 11.  After significant litigation, the Debtor consented to the appointment of a Chapter 11 trustee, and the appointment was ordered on September 13, 2019.  ECF 52.  Cheryl Rose was appointed as Chapter 11 trustee on September 30, 2019, and she continues to serve in that capacity.

2. In 2015, the members executed the "Operating Agreement for Member-Managed Amadues Development LLC", including related exhibits (referred to as the "Operating Agreement").  Ex. B, ECF 179-2; Ex. 2, ECF 185-2.  The Operating Agreement set forth the general management principles of the company, including:

> Article 8 – Voting; Members Meetings (This section is overwritten by Exhibit A)
> 8.1 Voting: Except to the extent provided to the contrary in this Operating Agreement, all Members will be entitled to vote on any matter submitted to a vote of the Members.
> (a) [CROSSED OUT]
> (b) [CROSSED OUT]
> *****
> Article 9 – Management of the Company
>
> 9.1 Management: The company will be managed by all of its General Members.

2

a) Subject to the delegation of rights and powers provided for herein, the General Members will have the sole right to manage the business of the company and will have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company.

b) the General Members may appoint a President, Treasurer, Secretary, or such other Officers as they may deem necessary or appropriate.

c) the General Members may appoint, employ, or otherwise contract with other persons or entities for the transaction of business of the Company or the performances of services for or on behalf of the company as they may deem necessary or appropriate. The Members may delegate to any Officer of the Company or to any other person or entity such authority to act on behalf of the Company as they may deem appropriate.

d) any General Member, Officer, or other persons specifically authorized by the Members may execute any contract or other agreement or document on behalf of the Company and may execute and file on behalf of the Company with the secretary of state any document required or permitted to be filed under the LLC laws of the State of Maryland.

*****

10.2 Indemnification: except as otherwise provided in this Article, the Company will indemnify any Member and may indemnify any employee or agent of the Company who was or is a party or is threatened to be made a party to any action, suit or proceeding, other than an action by or in the right of the Company, by reason of the fact that such person is or was a Member, employee or agent of the Company against expenses, including attorney's fees, judgments, penalties, fines, and amounts paid in settlement actually and reasonably incurred by such person in connection with the action, suit or proceeding, if the person met the standard of conduct set forth above in this Article.

a) To the extent that a Member, employee, or agent of the Company has been successful on the merits or otherwise in defense of an action, suit, or proceeding, such person will be indemnified against actual and reasonable expenses, including attorney's fees, incurred by such person in connection with the action, suit, or proceeding in any action suit or proceeding brought to enforce the mandatory indemnification provided herein. Any indemnification permitted under this Article, unless ordered by a court, will be made by the Company only as authorized in the specific case upon a determination that the indemnification is proper under the circumstances because the person to be indemnified has met the applicable standard of conduct. That determination will be made by a majority vote of the Members who are not parties or threatened to be made parties to the action, suit, or proceeding.

b) No indemnification will be provided to any Member, employee, or agent of the Company for or in connection with the receipt of a final benefit to which such person is not entitled, voting for or assenting to a distribution to Members in violation of this Operating Agreement or the Act, or a knowing violation of law.

ECF 179-2 at pp. 54-58 of 284.

3. Exhibit A to the Operating Agreement contains the "Member list and responsibilities."

*Id*. at p. 60.

4. It provides:

General members (GP) and limited members (LP) listed above form the alliance to develop the property . . .
*****
GP responsible for company operation, accounting, compliance and overall project profitability.
GP responsible for obtaining additional financing and corresponding personal guarantee that may be needed to complete the project.
LPs are passive investors and do not participate in company operation.
LPs are not responsible for obtaining additional financing.
Interest and fee expenses from additional financing will be a company cost item and reflect in company profit/loss.
*****
The company hereby authorize any one of the three general members specifically, Jian "Victor" Liu, Yufeng "Steve" Zhao, Yue "Mike" Wang, to conduct business for and on behalf of the Company and also be authorized to sign, initial, except or execute all documents in connection with company business transactions.

Company signing check policy: Checks under $50,000 can be signed by Jian "Victor" Liu alone. Check from $50,000-$100,000 must be signed by Jian "Victor" Liu plus one of the GPs. Checks equal or above $100,000 must be signed by all GPs.

**Voting: Both GP and LP's vote is required for 3 events:**
**1. Company dissolve and liquidation.**
**2. Company borrowing money.**
**3. Dead lock situation between GPs.**

**Under GP and LP voting situation, all member's voting rights will be counted according to their economic units results will be decided by simple majority of 51%. GPs decisions need to be voted is determined by a simple majority of 51%.**

*Id.* at pp. 61-62 of 284 (emphasis in original).[1]  Exhibit A also sets forth the initial capital

contribution and percentage participation for the two classes of members, general and limited.

The General Members were Liu, Yufeng Zhao, and Yue Wang.  Liu held 23% and Yufeng Zhao

and Yue Wang each held 11.5% economic interests.  The ten Limited Members owned partial

interests and include Jingjing Ye (4.5%), Xiaoyu Su (9%), Yanfei Li (9%), Zhen Gang Ji (4.5%),

Lily Tao (4.5%), Haiyan Wu (4.5%), Lei Ke (4.5%),[2] Wei Feng (4.5%), Yufeng Zhao (4.5%),

and Yue Wang (4.5%).  *Id.* at 60 of 284.

> 5. On March 12, 2015, the members signed a Resolution stating:
>
> A meeting of the members/managers of this LLC was duly called and held on 12th day of March, 2015. All the members/managers were present at said meeting and at the meeting it was decided, by majority vote that:
>
> Effective today Mar/12/2015 and effective immediately, in the event of a decision deadlock situation on general company operation issues, Jian Victor Liu has the final right to make the decision, and other general partners shall accept and execute the decision with best effort under complete goodwill. Exception: the scope of decision above mentioned above excludes issues related to any change of partners membership interests.

*Id.* at p. 240 of 284.

> 6. The Debtor acquired lots of real property on Query Mill Road, Gaithersburg,

Maryland, in 2015 for $1,400,000.  The parties refer to the real estate as the "Subdivision".  The

Subdivision lots located at 13205 and 13223 Query Mill Road were unimproved, while the lot at

13211 Query Mill Road was improved by residential real property.

> 7. During the case the Chapter 11 trustee sold the Debtor's real property.  *See* ECF 111,

134, 137, 147 (13211 Query Mill Road sold for $450,000), 140, 142, 165 (13223 Query Mill

Road sold for $305,000), 148, 152, 172 (13205 Query Mill Road sold for $275,000).  The net

---

[1] "GP" refers to General Members and "LP" refers to Limited Members.
[2] Lei Ke was replaced by Chungte Teng.  ECF 186, Victor Aff. ¶12.

sales proceeds are insufficient to pay both the secured claim asserted by Ms. Wang and the remaining secured claim against the properties held by the Owner Group. The Chapter 11 trustee does not anticipate any distribution will be made to unsecured creditors in the absence of litigation recoveries.

***The Expulsion Litigation and the Specific Performance Litigation***

8. In August 2015, the Owner Group removed Liu from management. Liu and the Debtor sued the Owner Group in the Circuit Court for Montgomery County, Maryland, to challenge his expulsion (the "Expulsion Litigation"). On or about September 15, 2016, the Circuit Court determined that Liu was not expelled properly from the Debtor by the Owner Group.

9. The parties settled the Expulsion Litigation while the appeal of that decision was pending. On November 17, 2016, Liu, the Debtor, the Owner Group, and another entity entered into a Letter of Intent for Sale of Membership Interests in Amadues Development LLC (the "LOI"). Ex. 7, ECF 185-2 at pp. 19-27. Under the LOI, Liu agreed to purchase for $730,000 the aggregate 54.5% interests the Owner Group held in the Debtor. *Id.* Liu also agreed to repay the loan made by Xianghong Qi to the Debtor.[3] Liu retained separate counsel to negotiate the LOI on his behalf and paid her from his funds. *See* ECF 186, Liu Aff. at ¶20.

10. Liu did not comply with the LOI. *Id.* The Owner Group filed suit in the Circuit Court for Montgomery County on December 20, 2016 (the "Specific Performance Litigation") against Liu to compel him to sign a purchase agreement and comply with the terms of the LOI. The Owner Group amended the complaint to add the Debtor as a defendant in May 2017. *Id.* at ¶30.

---

[3] The Debtor owed $100,000 plus interest on the loan.

11. On March 19, 2018, the Circuit Court issued a memorandum and order granting the Owner Group's motion for summary judgment in the Specific Performance Litigation.  The Circuit Court determined that the LOI contained all of the material terms of the parties' agreement and was a binding and enforceable agreement.  *See* ECF 179-1 at p. 5 (the memorandum referenced into the record the attachments to the complaint filed in the related Adv. Proc. 19-00264, ECF 1-2 at p. 9).

12. The Circuit Court ordered Liu and the Debtor to sign a purchase agreement memorializing the terms of the LOI and fully perform the agreement within 10 days of the entry of the order.  Liu failed to comply with the order by not signing a purchase agreement and performing the agreement

13. On June 25, 2018, the Owner Group filed a Verified Petition for Contempt in the Specific Performance Litigation seeking a judgment against Liu and the Debtor in the amount of $871,678.08.  Ex. 17, ECF 185-4 at pp. 24-27. On November 1, 2018, the Circuit Court held a hearing to consider the petition for contempt.  Ex. 8, ECF 185-2 at pp. 61-62.  On December 10, 2018, the Circuit Court entered an order granting the petition for contempt and converting the March 19, 2018 judgment into a money judgment of $871,678.08 jointly and severally against Liu and the Debtor.[4]  ECF 185-4 at p. 29.  The order stated the contempt could be purged by executing a purchase agreement memorializing the LOI, posting a supersedeas bond of $871,678.08, or by paying the Owner Group the judgment amount of $871,678.08.  *Id.*  On December 26, 2018, Liu, individually and on behalf of the Debtor, filed an appeal of the contempt order to the Maryland Court of Special Appeals, Case No. CSA-REG-3047-2018.  *See* ECF 11-1 at p. 5; ECF 185-4 at p. 63.  On June 24, 2019, the Court of Special Appeals affirmed

---

[4] The docket reflects that the order was entered on December 17, 2018.  ECF 185-4 at p. 62 of 70.

the Circuit Court's judgment ordering specific performance.  *See* Ex. 14, ECF 28-14.  On July 3, 2019, Liu, on behalf of himself and the Debtor, executed the Membership Interest Purchase and Release Agreement.  *See* ECF 28-16 at p. 13 of 22.  But Liu did not perform as provided by the terms of the Agreement.  The Owner Group tried to enforce the contempt order, *see* ECF 186 at ¶¶67-69, and Liu filed the bankruptcy petition on behalf of the Debtor.

### *The Payment of Fees in the Specific Performance Litigation and the Borrowings from Liu and/or Ms. Wang*

14. William Chen, Esq. represented Liu through much of the Specific Performance Litigation and, apparently, the Debtor once it was made a defendant.  *See* Ex. G, ECF 179-2 at pp. 83-227 of 284.  The engagement terminated around June 2018, and other attorneys were retained.  *See id.* at pp. 212-214.  Brian E. Barkley, Esq. was retained from January to April 2018.  *Id.* at pp. 243-254.  As described further below, Liu paid him $26,920.00 from the Debtor's account.  Ex. F, *id.* at p. 81. Mark G. Chalpin, Esq. was retained around April 2018.  Ex. G, *id.* at pp. 257-258.  He was paid $41,030 for his services.  Ex. F, *id.* at p. 81.

15. From the inception of the Specific Performance Litigation in December 2016 through October 2017 (just before Liu began borrowing from himself and/or Ms. Wang), Mr. Chen sent 11 invoices to Liu, in Liu's name, that Liu paid from the Debtor's bank account for legal work performed on that case.  His time entries and invoices were submitted in the record.  *See* Ex. G, ECF 179-2.  The invoices show Mr. Chen's work on the Specific Performance Litigation, including working on dispositive motions, discovery motions, discovery practice, research on legal issues, pre-trial preparation, hearing preparation, and communications with opposing counsel, the court, and witnesses.  There are a handful and *de minimis* amount of time entries during this period associated with the Expulsion Litigation.  *See id.*

16. The payments to Mr. Chen from the Debtor from December 2016 to October 2017

follow:

| Check # | Check Date | Amount | Invoice Paid |
|---------|-----------|--------|--------------|
| No. 150 | December 20, 2016 | $4,564 | #46633 (balance from other invoices) |
| No. 151 | January 6, 2017 | $3,525 | #46633 (time entries from December 1-31, 2016) |
| No. 197 | February 7, 2017 | $11,025 | #46645 (time entries from January 1-31, 2017) |
| No. 199 | March 9, 2017 | $8,780 | #46657 (time entries from February 1-28, 2017) |
| No. 154 | April 11, 2017 | $17,300 | #46669 (time entries from March 1-31, 2017) |
| No. 201 | May 5, 2017 | $16,830 | #46680 (time entries from April 1-28, 2017) |
| No. 206 | June 9, 2017 | $7,800 | #46692 (time entries from May 1-31, 2017) |
| No. 213 | July 7, 2017 | $5,010 | #46703 (time entries from June 1-29, 2017) |
| No. 227 | August 11, 2017 | $10,800 | #46714 (time entries from July 6-31, 2017) |
| No. 235 | September 19, 2017 | $7,320 | #46724 (time entries from August 1-31, 2017) |
| No. 240 | October 25, 2017 | $6,600 | #46735 (time entries from September 1-30, 2017) |
| **Total paid to Mr. Chen from the Debtor for Specific Performance Litigation work before borrowing from Liu and/or Ms. Wang** | | **$99,554.00** | |

*See* Ex. G, ECF 179-2 at pp. 88-93 and 132-185.  There is no evidence before the Court that any

of the legal fees or costs generated by Mr. Chen in defending Liu in the Specific Performance

Litigation were paid by Liu.

17. In November 2017, the Debtor had less than $20,000 in its bank account and the

Specific Performance litigation was proving to be costly.  From November 2017 through July

2019, Liu, on behalf of the Debtor, began borrowing money from himself and/or Ms. Wang to

pay legal fees and for other purposes.  The promissory notes and deeds of trusts attached to Ms.

Wang's Proof of Claim No. 10 show that the Debtor borrowed a total principal amount of

$353,657[5] through various notes, of which $247,940 was secured by two deeds of trust and

$105,717 was unsecured.  *See* Proof of Claim No. 10-1.

---

[5] Ms. Wang's Proof of Claim No. 10 asserts a claim for $399,345, of which $277,899 is secured and $121,446 is unsecured.  The filed claim does not provide an itemization of the debt.  *But see* ECF 189 at ¶80 (proposed statement of undisputed facts filed by Ms. Wang).  Presumably the difference between the loan principal and the amount claimed is interest and other charges.

18. Specifically, on November 17, 2017, Liu executed a promissory note on behalf of the Debtor in the amount of $49,000 ("Loan 1") payable to Ms. Wang and Liu. ECF 186, Liu Aff. ¶35; Ex. 12, ECF 185-3 at p. 1 of 142. Liu signed the promissory note on behalf of the Debtor as borrower and also signed for himself personally as lender. Ex. 12, ECF 185-3 at p. 3. The money came from a joint bank account in the name of Liu, Ms. Wang, and Geping Wang POA. *Id.* at p. 4. On November 20, 2017, the balance in the Debtor's bank account X277 after the deposit was $66,707. *Id.* From Loan 1, Liu paid $24,620 in legal fees and costs. Ex. H, ECF 179-2 at p. 260 of 284.

19. On December 20, 2017, Liu executed a promissory note on behalf of the Debtor in the amount of $49,980 ("Loan 2") payable to Ms. Wang and Liu. ECF 186, Liu Aff. ¶40; Ex. 12, ECF 185-3 at p. 72 of 142. Liu signed the promissory note on behalf of the Debtor as borrower, and also signed for himself personally as lender. Ex. 12, ECF 185-3 at p. 16. The money came from a joint bank account in the name of Liu, Ms. Wang, and Geping Wang POA. *Id.* at p. 127. From Loan 2, Liu paid $38,220 in legal fees and costs. Ex. H, ECF 179-2.

20. On February 1, 2018, Liu executed a promissory note on behalf of the Debtor in the amount of $49,980 ("Loan 3") payable to Ms. Wang and Liu. ECF 186, Liu Aff. 42; Ex. 12, ECF 185-3 at p. 60 of 142. Liu signed the promissory note on behalf of the Debtor as borrower, and also signed for himself personally as lender. Ex. 12, ECF 185-3 at p. 62. The money derived from a joint bank account in the name of Liu, Ms. Wang, and Geping Wang POA. *Id.* at p. 63. On February 1, 2018, after the deposit was made, the Debtor's checking account balance was $81,195.96. *Id.* From Loan 3, Liu paid $36,000 in legal fees and costs. Ex. H, ECF 179-2.

21. On February 23, 2018, Liu executed a promissory note on behalf of the Debtor in the amount of $49,980 ("Loan 4") payable solely to Ms. Wang. Ex. 12, ECF 185-3 at pp. 14,16 of

142.  The money came from a joint bank account in the name of Liu, Ms. Wang, and Geping

Wang POA.  *Id.* at p. 127.  From Loan 4, Liu paid $36,920 in legal fees.  Ex. H, ECF 179-2.

22. On March 20, 2018, Liu executed a promissory note on behalf of the Debtor in the

amount of $49,000 ("Loan 5") payable solely to Ms. Wang.  ECF 186, Liu Aff. ¶52; Ex. 12, ECF

185-3 at pp. 29, 31 of 142.  From Loan 5, Liu paid $15,300 in legal fees.  Ex. H, ECF 179-2.

The source of Loan 5 was cash deposits or cashier's checks of unclear origin.

23. On March 22, 2018, Liu executed on behalf of the Debtor two deeds of trust

encumbering the Debtor's real property as security for repayment of the foregoing loans.  Ex. 16,

ECF 185-4 at pp. 14-23 of 32; ECF 186, Liu Aff. ¶53.  One deed of trust secured Loans 1

through 3 in a principal amount of $148,960, plus interest, and was recorded on April 6, 2018

(the "April 6 Deed of Trust").  *Id.*; *contra* ECF 46 at p. 4 of 6 (The Debtor's amended Schedule

D states that the April 6 Deed of Trust only secures the principal amount of the notes and does

not include interest.).  The April 6 Deed of Trust is in favor of Ms. Wang and Liu.  *Id.*  The

second deed of trust secured Loans 4 and 5 in the principal amount of $98,980, plus interest, and

it was recorded on March 29, 2018 (the "March 29 Deed of Trust").  Ex. 16, ECF 185-4 at pp.

14-18; *contra* ECF 46 at p. 4 of 6 (The Debtor's amended Schedule D states that the March 29

Deed of Trust only secures the principal amount of the notes and does not include interest.).  The

March 29 Deed of Trust is in favor of Ms. Wang as the sole noteholder.  *Id.*

24. The total borrowed from Loans 1 through 5 was $247,940.00.  The funds were

deposited in the Debtor's bank account.  Liu used $151,060 to pay legal fees and costs for the

Specific Performance Litigation and $96,880 for other costs and expenses.  *See* Ex. H, ECF 179;

Ex. 11, ECF 185-2.  The payments for legal fees follow:

| Check # | Check Date | Amount | Invoice Paid |
|---|---|---|---|
| No. 242 | November 17, 2017 | $16,200 | #46746 (time entries for Mr. Chen for October 1-23, 2017) |
| No. 306 | December 10, 2017 | $8,420 | #46758 (time entries for Mr. Chen for November 1-30, 2017) |
| No. 309 | January 20, 2018 | $23,220 | #46768 (time entries for Mr. Chen for December 1-31, 2017) |
| No. 274 | February 14, 2018 | $36,000 | #46779 (time entries for Mr. Chen for January 1-30, 2018) |
| No. 01009481 | March 20, 2018 | $25,000 | #46788 (time entries for Mr. Chen for February 1-28, 2018) |
| No. 297 | March 1, 2018 | $11,920 | Payment to Mr. Barkley for legal fees |
| No. 313 | January 19, 2018 | $15,000 | Payment to Mr. Barkley for legal fees |
| | | $15,300 | Payment to Mr. Chalpin for legal fees[6] |
| **Total paid to attorneys from the Debtor for Specific Performance Litigation work from borrowings from Liu and/or Ms. Wang** | | **$151,060.00** | |

*See* Ex. G, ECF 179-2 at pp. 170-207, 244-256; Ex H.

25. On June 25, 2018, Liu executed a promissory note on behalf of the Debtor in the amount of $27,000 ("Loan 6") payable solely to Ms. Wang. ECF 186, Liu Aff. ¶57; Ex. 12, ECF 185-3 at pp. 105, 107 of 142. Liu signed the promissory note on behalf of the Debtor as borrower. Ex. 12, ECF 185-3 at p. 107 of 142. The money came from a joint bank account in the name of Ms. Wang, Liu, and Geping Wang POA. *Id.* at p. 108. On June 25, 2018, after the deposit was made, the Debtor's checking account balance was $28,042.84. *Id.* at p. 109. From Loan 6, Liu did not pay legal fees. *See* Ex. H, ECF 179.

26. On July 16, 2018, Liu executed a promissory note on behalf of the Debtor in the amount of $20,000 ("Loan 7") payable solely to Ms. Wang. ECF 186, Liu Aff. ¶59 (misnumbered as Yanping Loan 6); Ex. 12, ECF 185-3 at pp. 81, 83 of 142. Liu signed the promissory note on behalf of the Debtor as borrower. Ex. 12, ECF 185-3 at p. 83. The money

---

[6] *See* Ex. H, ECF 179 (the parties did not submit a copy of the cancelled check to Mr. Chalpin, however they both stipulate that a payment was made to Mr. Chalpin with funds from Loan 5).

loaned came from two sources: one check for $10,000 came from the checking account of Ms.

Wang only, *id.* at p. 85, and a second check for $10,000 came from the checking account of Ms.

Wang, Liu and Geping Wang POA.  *Id.*  On July 16, 2018, after the first $10,000 deposit was

made, the Debtor's checking account balance was $25,569.20, and on July 19, 2018, after the

second $10,000 was made, the Debtor's checking account balance was $11,564.20.  *Id.* at p. 84.

From Loan 7, Liu paid $500 in legal fees and costs.  Ex. H, ECF 179-2; *see* ECF 179-2 at p. 257

of 254.

    27. On October 4, 2018, Liu executed a promissory note on behalf of the Debtor in the

amount of $30,000 ("Loan. 8") payable to Ms. Wang and Chengyu Liu.  ECF 186, Liu Aff. ¶62

(mislabeled as Yanping Loan 7); Ex. 12, ECF 185-3 at pp. 113-114 of 142.  The loan funds were

deposited in three installments:

- On October 4, 2018, a $10,000 deposit was made.  Ex. 12, ECF 185-3 at p. 116 of 142. The money came from the checking account of Ms. Wang.  *Id.*  After the deposit, the balance on the Debtor's bank account was $11,843.85.  *Id.* at p. 115.
- On October 12, 2018, $10,000 deposit was made.  *Id.* at 116.  The money came from the checking account of Chengyu Liu.  *Id.*  After the deposit, the balance on the account was $20,832.15.  *Id.* at p. 115.
- On November 28, 2018, a $10,000 deposit was made by cash or a cashier's check.  *Id.* at 116 of 142.  After the deposit, the balance on the account was $10,089.65.  *Id.*

From Loan 8, Liu paid $15,671.75 in legal fees and costs primarily for work done on the Specific

Performance Litigation and $7,390.10 to attorney Daniel Press.  Ex. H, ECF 179-2; ECF 179-2 at

pp. 243-256 of 284 (time records for Mr. Press are not in the record).

    28. On June 29, 2019, a meeting of members was held at Chungte Teng's home in

Potomac, Maryland.  The following members attended: Liu (23%), Chungte Teng (4.5%), Zhen

Ji (4.5%), Hiayan Wu (4.5%), and Lily Tao (4.5%); their interests represented 41% of the

company.  In this meeting Liu explained the possibility of filing bankruptcy for the Debtor.  ECF

186, Liu Aff. ¶68.

29. On July 1, 2019, Liu executed a promissory note on behalf of the Debtor for $20,000 ("Loan 9") payable to Ms. Wang. *Id.* at ¶70; Ex. 12, ECF 185-3 at p. 94 of 142. The Debtor's bank account had been garnished at this time. Ex. 12, ECF 185-3 at p. 94. Thus, Ms. Wang paid the Debtor's expenses directly and no money was deposited into the Debtor's bank account.

30. On July 3, 2019, Liu executed a promissory note on behalf of the Debtor in the amount of $8,717 ("Loan 10") payable to Ms. Wang. ECF 186, Liu Aff. ¶72; Ex. 12, ECF 185-3 at pp. 121-122 of 142. Like the previous loan, the Debtor's bank account was being garnished and the funds were needed immediately to pay attorney fees for the bankruptcy filing. The money went directly to the attorney and no money was deposited into the Debtor's bank account. *Id.*

31. On July 15, 2019, Liu filed for bankruptcy on behalf of the Debtor.

32. There were three member meetings held in which the loans from Ms. Wang were discussed: September 15, 2018, August 24, 2019, and June 3, 2021. At each meeting Chungte Teng (4.5%), Zhen Ji (4.5%), Hiayan Wu (4.5%), Wei Feng (4.5%), Lily Tao (4.5%) and Liu (23%) were present; their interests represented 45.5% of the company. At the September 15, 2018 meeting, Liu states he advised the members of the status of the litigation and development of the Subdivision, and that he borrowed approximately $300,000 "from [Ms. Wang]," which were secured by deeds of trust. ECF 186, Liu Aff. ¶61. Liu states the members present approved the loans and urged Liu to find experienced attorneys to appeal the lower court judgment and sell the Subdivision lots as soon as possible. *Id.* Liu states that at the August 24, 2019 meeting, the members present again approved the Ms. Wang's loans and voted on other measures. *Id.* at ¶75. He also states that at the June 3, 2021 meeting, the members present

summarized the prior meetings, discussed economic matters, and reviewed Ms. Wang's loans. *Id.* at ¶76.

## Applicable Legal Standard

Summary judgment, governed by Fed. R. Civ. P. 56, made applicable here under Fed. R. Bankr. P. 7056, is appropriate if there is no genuine dispute over any material facts and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

> In evaluating a summary judgment motion, a court "must consider whether a reasonable [factfinder] could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *Apex*, 190 F.3d at 633. In doing so, a court is not entitled to either weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). If the moving party is unable to demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 351–352 (4th Cir. 2007).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Those specific facts must be supported by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Matushita*, 475 U.S. at 586-587. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact." *Anderson*, 477 U.S. at 247-248.  A "scintilla of evidence" provided by the nonmovant is insufficient to establish "concrete evidence" that a reasonable factfinder could find in the nonmovant's favor at trial.  *Id.* at 252, 256.  Whereas the moving party must establish its right to judgment as a matter of law and can establish this by showing that there is an absence of evidence to support the nonmoving party's case.  *Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §2720 at 10 (2d ed. Supp. 1994) and *Celotex*, 477 U.S. at 325).

## Conclusions of Law

The Owner Group seeks disallowance of the loan claim.  There is no dispute that sufficient net proceeds remain from the sale of the real property to pay the secured claim if allowed.  At this time, however, there will be no distribution to unsecured creditors unless certain causes of action held by the estate provide a recovery.  Accordingly, as discussed with the parties at the hearing, the court will initially address the secured claim.

The secured claim is based on the April 6 Deed of Trust and the March 29 Deed of Trust. The April 6 Deed of Trust secured Loans 1, 2, and 3.  Statement of Facts ("SOF") at ¶23.  Loans 1 through 3 were made to the Debtor jointly by Liu and Ms. Wang, and the April 6 Deed of Trust runs in favor of both.  The March 29 Deed of Trust secured Loans 4 and 5.  Loans 4 and 5 were made to the Debtor by Ms. Wang, and the March 29 Deed of Trust runs in favor of her.  *Id.*  The source of the funds for Loan 4, however, was the same bank account Liu used to make Loans 1 through 3 and in which he held an ownership interest.  *See id*. ¶¶18-21.  Although Ms. Wang filed the claim and seeks its allowance, the Court will not ignore Liu's direct interest in Loans 1 through 3 and the April 6 Deed of Trust, and his ownership interest in the funds that were the source of Loan 4 secured by the March 29 Deed of Trust.

16

A creditor in a Chapter 11 bankruptcy proceeding may file a proof of claim. 11 U.S.C. § 501(a). A proof of claim is the creditor's statement as to the amount and character of the claim. Fed. R. Bankr. P. 3001(a). The holder of an "allowed claim" may receive distributions from the bankruptcy estate in a Chapter 11 proceeding. *In re Harford Sands Inc.*, 372 F.3d 637, 640–41 (4th Cir. 2004).

> The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim. The creditor's filing of a proof of claim constitutes prima facie evidence of the amount and validity of the claim. 11 U.S.C. § 502(a); Fed. R. Bankr.P. 3001(f). The burden then shifts to the debtor to object to the claim. 11 U.S.C. § 502(b); *Finnman*, 960 F.2d at 404. The debtor must introduce evidence to rebut the claim's presumptive validity. Fed. R. Bankr.P. 9017; Fed.R.Evid. 301; 4 Collier at ¶ 501.02[3][d]. If the debtor carries its burden, the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence.2 Id. at ¶ 502.02[3][f].

*Id.*

The creditor's burden is "is heightened when it is an 'insider' of the debtor." *Id.* at 640–41 (citing *Pepper v. Litton*, 308 U.S. 295, 306 (1939)).

> An insider's dealings with a bankrupt corporation are ordinarily subject to "rigorous" or "strict" scrutiny. *Fabricators Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir.1991); *Brewer v. Erwin & Erwin, P.C.*, 942 F.2d 1462, 1465 (9th Cir.1991); *In re Inter–Island Vessel Co.*, Inc., 98 B.R. 606, 608–09 (Bankr.D.Mass.1988). In such a situation, the "burden is on an insider claimant to show the inherent fairness and good faith of the challenged transaction."

*Id*. In *Harford Sands*, the Fourth Circuit cited with approval *Fabricators Inc. v. Technical Fabricators, Inc.*, which explained the underlying rationale for the strict scrutiny of insider transactions:

> The bankruptcy court has long been recognized as a court of equity. . . . Its equitable powers allow a bankruptcy court to produce fair and just results to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.

*Fabricators Inc. v. Technical Fabricators, Inc.*, 926 F.2d at 1464 (internal quotations and citations omitted).

17

Here, there is no dispute that Liu, as a managing member and person in control of the Debtor, is an insider.  §101(31)(B)(ii), (iii), (v).  Ms. Wang, as the spouse of a managing member of the Debtor, also is an insider.  §101(31)(B)(iv).

Generally speaking, Liu used the loan funds for two purposes: to pay legal fees and costs of the Specific Performance Litigation and to pay other expenses of the Debtor.  The Court will begin by addressing the proceeds of the secured loans that were used to pay Specific Performance Litigation fees and costs.

### Secured Loan Funds Used to Pay Specific Performance Litigation Legal Fees and Costs

From November 17, 2017 through March 20, 2018, the total amount lent to the Debtor from Loans 1 through 5 secured by the two deeds of trust was $247,940.  SOF at ¶24.  The records submitted by the parties establish that, from these loan proceeds, Liu used $151,060 to pay legal fees and costs for the Specific Performance Litigation.  *Id.*

The Specific Performance Litigation was a breach of contract action against Liu, personally.  The Debtor was not even a defendant in that action until May 2017, six months after it was filed.  The parties earlier settled the Expulsion Litigation by entering into the LOI.  The LOI required Liu, personally, to purchase the 54.5% member interests of the Owner Group for $730,000.  SOF ¶9.  It also required Liu to "ensure that the loan from Xianghong Li . . . will be paid in full."  Ex. 7 at ¶2, ECF 185-2.

The only monetary obligations imposed by the LOI ran to Liu, not the Debtor.[7]  The Debtor's obligations essentially were to provide a release and to keep the terms of the LOI confidential.  *Id.* at ¶¶ 6.b and 8.  By the time the Debtor became a defendant in the action, the

---

[7] This point has been acknowledged by Mr. Chen in a related contested matter:  "The only relief sought against [the Debtor in the Specific Performance Litigation] was a Court Order requiring it to execute the Purchase Agreement. Significantly, no monetary judgment was sought against [the Debtor]."  ECF 230 at p. 6, n. 2 (citations omitted).

terms of the LOI were public.  Thus, the Debtor's obligation to keep those terms confidential was

moot.  In addition, the Circuit Court ruled the LOI contained all of the material terms of the

parties' agreement and was a binding and enforceable agreement.  SOF ¶11.  This means the

Debtor's release in the LOI was fully enforceable against it, and the Debtor needed to take no

further action for its release to be effective.  By the time the Owner Group filed the petition for

contempt in June 2018, the Debtor had no meaningful unfulfilled obligations under the LOI that

could be the subject of a specific performance claim.  Thus, until the petition for contempt was

filed and granted against both Liu and the Debtor, Liu, but not the Debtor, faced substantial

financial jeopardy in the Specific Performance Litigation. The loans were made and the fees

were paid well before the petition for contempt was filed or granted.

On the record presented, no distinction was made in the fees between representing Liu in

the Specific Performance Litigation and representing the Debtor.  No allocation was made

between the two.

Liu's borrowing from himself and his wife, or from his wife, and pledging the Debtor's

assets to secure those loans, to pay $151,060 of his personal legal fees, was an improper use of

the Debtor's assets.  He, not the Debtor, faced substantial financial jeopardy during this period.

The fees benefitted him personally.  He paid them to the detriment of the Debtor's creditors and

members, including the Owner Group.

Liu has offered no justification for paying the fees from the Debtor's funds.  He was not

entitled to indemnification under the Operating Agreement for his legal fees in the Specific

Performance Litigation.  The suit was a breach of contract against him personally.  SOF ¶2; Ex. 2

at ¶10.2, ECF 185-2.  Further, he lost the Specific Performance Litigation, and the

indemnification provision requires that he must be successful in any suit to be indemnified.  *Id.*

at ¶10.2.a.  In addition, he did not follow the proper procedures for seeking indemnification.
*Id*.  Moreover, the Operating Agreement expressly provides that indemnification is not provided
in connection with "receipt of a financial benefit to which [Liu] is not entitled." *Id*. at ¶10.2.b.
The payment of his personal legal fees was a "financial benefit" to which he was not entitled.
Liu cannot obtain by fiat and abuse of his member position that to which he is not entitled to
under the Operating Agreement.

Liu's borrowing to pay his legal fees was not only improper, it was unauthorized under
the Operating Agreement.  Under the Maryland Limited Liability Company Act, an "'[o]perating
agreement' means the agreement of the members and any amendments thereto, as to the affairs
of a limited liability company and the conduct of its business." Md. Code Ann., Corps. & Ass'ns.
§4a–101(q) (referred to as "Md. Code").  The Act was enacted to "give the maximum effect to
the principles of freedom of contract and to the enforceability of operating agreements." *Id*. at
§4A-102(a).  An LLC's operating agreement is a binding contract whose terms governs the
affairs of the LLC and sets forth the members' management and membership rights and duties.
51 Am.Jur.2d Limited Liability Companies §4; *see* Md. Code §4a–402.

Consequently, an LLC's operating agreement is interpreted in accordance with
prevailing contract law.  *See Plank v. Cherneski*, 231 A.3d 436, 449 (Md. 2020) ("The members'
relationship with one another, the affairs of the LLC, and the conduct of the LLC's business are
governed by contract, defined as an operating agreement.  CA §4A-101(p)").  Under Maryland
law, "[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions."
*Tomran, Inc. v. Passano*, 891 A.2d 336, 344 (Md. 2006).  Maryland follows the law of objective
contract interpretation. *Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007); *see also Myers v.
Kayhoe*, 892 A.2d 520, 526 (Md. 2006); *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999).

When interpreting a contract, the court is tasked with determining "from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *General Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985). The "clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." *Blakehurst v. Baltimore County*, 807 A.2d 179, 187 (Md. Ct. Spec. App. 2002). "A contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 547 (Md. 2003).

Here, the Operating Agreement is unambiguous. It contains numerous provisions establishing the rights, obligation and duties of the members. But it highlights in bold lettering three actions that required the vote of all of the members of the Debtor and 51% approval:

> **Voting: Both GP and LP's vote is required for 3 events:**
> **1. Company dissolve and liquidation.**
> **2. Company borrowing money.**
> **3. Dead lock situation between GPs.**
>
> **Under general partner and limited partners voting situation all members voting rights will be counted according to their economic units results will be decided by simple majority of 51%. General partners decisions need to be voted is determined by a simple majority of 51%.**

SOF ¶4 (emphasis in original). The provision is the only operative provision in the Operating Agreement written in boldface, signifying its importance. It could not be clearer. Any of the three actions, including borrowing money, required a 51% approval of all members. Thus, neither Liu, nor any other General Member, had actual authority to borrow without the express 51% authorization. Liu did not obtain that authorization. He lacked authority to borrow the funds.

Ms. Wang makes numerous arguments why the provision should not be applied as written. Only two need to be addressed. She contends the March 12, 2015 members' resolution gave Liu authority to borrow the funds. It provided:

> A meeting of the members/managers of this LLC was duly called and held on 12th day of March, 2015. All the members/managers were present at said meeting and at the meeting it was decided, by majority vote that:

> Effective today Mar/12/2015 and effective immediately, in the event of a decision deadlock situation on general company operation issues, Jian Victor Liu has the final right to make the decision, and other general partners shall accept and execute the decision with best effort under complete goodwill. Exception: the scope of decision above mentioned above excludes issues related to any change of partners membership interests.

SOF ¶5. The resolution does not apply here. It applies only in a "decision deadlock situation." There is no evidence that Liu made a proposal to the other members to borrow and that there was a "decision deadlock" on the proposal. The Owner Group states in an affidavit that no such proposal was made. *See* ECF 179-3. Further, the resolution applies only to "general company operation issues." Borrowing money—especially to pay Liu's unauthorized legal expenses—is not a general company operation issue.

Ms. Wang next argues that the Owner Group is not entitled to rely on the provisions of the Operating Agreement because once they obtained a judgment against the Debtor and were adverse to the Debtor, they abandoned and forfeited their rights under the Operating Agreement. The Court disagrees. But the Owner Group remained members of the Debtor after obtaining the contempt judgment. Although Liu personally agreed to buy their interests under the LOI, he failed to do so. They remained members entitled to assert the rights of members. They also are creditors as a result of the contempt judgment. *See Virginia Broadband, LLC v. Manuel*, 538 B.R. 253, 262 (W.D. Va. 2015) (in bankruptcy, insiders can hold valid claims against the debtor

and have valid equity interests).  Accordingly, Liu lacked authority to borrow money on behalf of the Debtor.

The Court therefore concludes that it was improper for Liu to borrow funds from himself and/or his wife, secured by Debtor's assets, to pay his personal legal fees, and that, in any event, he lacked authority to borrow funds on behalf of the Debtor.  These two independent conclusions are sufficient to rebut the presumptive validity of the claim.  *Harford Sands,* 372 F.3d at 640–41. Ms. Wang and Liu, therefore, have "the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence."  *Id*.  The claim is reviewed with "strict scrutiny" and their burden is "heightened" to show "the inherent fairness and good faith of the challenged transaction."  *Id*.

The Court concludes that, taking all inferences to be drawn from the underlying facts in the light most favorable to Liu and Ms. Wang, no reasonable factfinder could conclude that they can meet that standard.  Rather than being inherently fair and made in good faith, the secured borrowings to pay Liu's personal legal fees was a blatant abuse of Liu's status as a managing member to benefit himself at the expense of the Debtor.

As justification for the borrowings and payment of fees, Ms. Wang states that the Debtor also was a party to the Specific Performance Litigation during the period the secured loans were made.  She contends therefore that the payment of fees was a proper use of Debtor's assets.

The $151,060 of legal fees paid from Loans 1 through 5 were paid before the petition for contempt was filed.  During this time, Liu faced overwhelmingly greater risk than the Debtor. Ms. Wang's contention at best weighs in favor of making some (small) allocation of the fees to the benefit of the Debtor.  The Court, however, concludes that none of the legal fees and costs during this period should be allocated to the Debtor.  There is no evidence before the Court that

Liu or the attorneys in the Specific Performance Litigation made any distinction between the Debtor's and Liu's respective obligations under the LOI in that case. There is no distinction in the monthly fee statements between time spent representing Liu and time spent representing the Debtor. There is no evidence that attorney fees were incurred, for example, seeking to convince the Circuit Court that the Debtor should be dismissed from the case or at least not lumped together with Liu because the Debtor was not obligated to take any action under the LOI. Accordingly, the Court will make no allocation of the $151,060 of fees paid from Loans 1 through 5 for work performed on behalf of the Debtor.

Ms. Wang next argues Liu had apparent authority to borrow on behalf of the Debtor. Because the court has concluded Liu's payment of the fees was improper and a misappropriation of the Debtor's assets, the question of Liu's apparent authority is academic, at least as it applies to his borrowing $151,060 from Loans 1 through 5 to pay fees. Nevertheless, because the question may be pertinent to the issue of the use of loan proceeds to pay other expenses, the court addresses it here.

Under Maryland law, "an agent's authority to act must come from the principal. . . . The authority conferred upon the agent by the principal can take two forms: actual authority or apparent authority." *Tobacco Tech., Inc. v. Taiga Int'l N.V.*, 388 F. App'x 362, 369 (4th Cir. 2010) aff'd, 388 F. App'x 362 (4th Cir. 2010) (cleaned up, citing Maryland case law authority).

> Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal. As to the third person, apparent authority when present trumps restrictions that the principal has privately imposed on the agent. The relevant appearance is that the principal has conferred authority on an agent.

Restatement (Third) Of Agency §2.03 (2006). It is well established:

that an agent cannot create his own authority to represent a principal, . . . it follows that an agent's statements that he has such authority cannot, without more, entitle a third party to rely on his agency. . . .  An agent's authority must be conferred by some manifestation by the principal that the agent is authorized to act on the principal's behalf.

*Auvil v. Grafton Homes, Inc.*, 92 F.3d 226, 230 (4th Cir. 1996) (cleaned up).  Assessment of whether the corporation so permitted certain conduct is done by examining the acts of the principal, not the agent.  *Integrated Consulting Servs., Inc. v. LDDS Comm'cns, Inc.*, 996 F.Supp. 470, 476 (D. Md.1998); *Tobacco Tech., Inc.*, 626 F. Supp. 2d at 548; *see Jackson v. 2109 Brandywine, LLC*, 952 A.2d 304, 316 (Md. Ct. Spec. App. 2008) ("apparent authority exists only where a principal makes manifestations to a third party that would indicate the agent had any authority to take the relevant actions").

For Loans 1 through 3, on which Liu was both the lender and signed on behalf of Debtor as borrower, SOF ¶¶18, 19, 20, 23, apparent authority has no place.  The funds for Loan 4 came from a bank account in which Liu was a title owner.  SOF ¶21.  Again, apparent authority cannot apply where Liu is on both sides of the transaction.  For Loan 5, Ms. Wang states she made her decision to provide the loans solely on the information provided by Liu.  *See* ECF 187.  There was no manifestation from the Debtor supporting Liu's authority at the time the loans were made.  In any event, Ms. Wang cannot show it was inherently fair to rely on her husband to make a secured loan to his business to allow it to pay his personal legal fees.

Ms. Wang contends that even if Liu borrowed money and signed off on the promissory notes and deeds of trust without authority, the Debtor later ratified the transactions.  Therefore, according to Ms. Wang's argument, the unsecured and secured debts are binding on the Debtor. The Court disagrees.

Under Maryland law, ratification applies when an agent, with actual or apparent authority, enters a transaction without authority and the principal later provides approval of the unauthorized act. *Tower Oaks Blvd., LLC v. Procida*, 100 A.3d 1255, 1272–73 (Md. 2014) (citing *In re Uwimana*, 274 F.3d 806, 812 (4th Cir.2001) (applying Maryland law)); *Bruffey Contracting Co., Inc. v. Burroughs Corp.*, 522 F.Supp. 769, 774–75 (D. Md.1981)). As a result, the business act becomes binding on the principal. *Tower Oaks Blvd.*, 100 A.3d at 1272 (citing *Bannon v. Warfield*, 42 Md. 22, 42 (1875)). The later ratification of the transaction relates back in time to the original date of the previously unauthorized act. *Id.* at 1272-1273 (citing *Lee v. Pfeifer*, 916 F.Supp. 501, 508 (D. Md.1996); 19 C.J.S. Corporations §707). A principal must have knowledge of all material facts to ratify an unauthorized act. *Id.* at 1273 (citing *Tricat Indus., Inc. v. Harper*, 748 A.2d 48 (Md. 2000); *Linden Homes, Inc. v. Larkin*, 191 A.2d 441 (Md. 1963)). Ratification may be expressed or implied. *Id.*

Here, Liu stated in his affidavit that he called meetings at which the members who attended expressly authorized him to continue with the legal defense of the Debtor. According to the Operating Agreement, the approval of the loans needed a 51% vote by the members. There were three pertinent member meetings where the loan funds were discussed: September 18, 2018, August 24, 2019, and June 3, 2021, and the members present only represented 45.5% of the vote. Thus, express ratification of the loans did not occur because the members who voted did not constitute at least 51% of the required interests.

Implied ratification may be found by the words, acts, or conduct by the principal, which reasonably show a desire to affirm the unauthorized act. *Tower Oaks*, 100 A.3d at 1273 (citations omitted). Ratification may be implied when the principal retains the benefit of the unauthorized act, and thus is deemed to have adopted or acquiesced. *Id.* Under implied

26

ratification, the principal must have knowledge of all the material facts of the unauthorized act. *Id.* Here, as discussed above, the legal fees benefitted Liu, not the Debtor. There was no benefit that the Debtor retained that could establish implied ratification.

Accordingly, the Court will disallow the $151,060 of the proceeds from Loans 1 through 5, secured by the two deeds of trust, that Liu used to pay legal fees and costs in the Specific Performance Litigation. The Court also will disallow any interest and charges related to the $151,060 principal amount of the loans.

### *Secured Loan Funds Used to Pay other Expenses Because Liu Stripped the Debtor's Cash to Pay his Legal Fees*

While Liu used $151,060 of the funds from Loans 1 through 5 to pay litigation costs, he used the remaining $96,880 to for purposes other than legal fees and costs in the Specific Performance Litigation. SOF ¶24. Liu's borrowing on behalf of the Debtor to pay legitimate Debtor expenses may lead to a different result under the ratification analysis, because the Debtor may have accepted the benefits of some of the loan funds that were used to pay legitimate property development costs. That issue is addressed further below.

Here, however, the Owner Group argues that, from December 2016, when the Specific Performance Litigation began, until Liu began borrowing from himself and/or Ms. Wang in November 2017, Liu paid $99,554 to Mr. Chen from the Debtor's bank account for representing Liu in that case. SOF ¶16. The Owner Group argues that, had Liu not used Debtor's funds to pay the litigations costs, he would have had no need to borrow funds to pay non-litigation costs, at least to the extent of the amount he used to pay litigation costs. They contend Liu and Ms. Wang should not be repaid for loans that would have been unnecessary if Liu had not improperly used the Debtor's funds to pay for litigation that benefitted him personally.

The Court agrees with the Owner Group. Liu blatantly misappropriated the $99,554 of the Debtor's funds to pay his legal fees during this period. There is no clearer example of this misappropriation than the fees that were incurred from December 2016, when the Specific Performance Litigation was filed, until May 2017, when the Debtor was added as a defendant. During that period, the Debtor was not even a defendant in the Specific Performance Litigation and Liu had no justification whatsoever for paying those fees with the Debtor's assets.

The fees Liu paid to Mr. Chen from the Debtor's account from May 2017 until November 2017, when Liu started borrowing, are equally improper, except that, to the extent some fees were incurred representing the Debtor's interest once it was named a defendant, those fees could have been appropriately paid by the Debtor. For the same reasons stated above, however, the Court will make no such allocation because neither Liu nor Mr. Chen did so, no basis for an allocation has been submitted into the record, and the relative risks faced by Liu and the Debtor in the litigation at that time were vastly different.

During this period, had Liu paid the $99,554 of legal fees to Mr. Chen with his own funds, the Debtor would have had an additional $99,554 to pay other expenses. As of November 2017, when Liu began borrowing, the Debtor had less than $20,000 of cash resources. SOF ¶17. There would have been no need to borrow $99,554 from Liu and/or Ms. Wang to pay other expenses if Liu had not misappropriated that amount.

Liu's misappropriation of $99,554 warrants disallowance of the loans to that extent. For the reasons stated above, Liu was not authorized to borrow on behalf of the Debtor under the Operating Agreement, and there has been no showing of "the inherent fairness and good faith of the challenged transaction." *In re Harford Sands Inc.*, 372 F.3d at 641. Accordingly, the Court will disallow $99,554 of the principal proceeds from Loans 1 through 5, secured by the two

deeds of trust, because Liu's borrowing of that amount was only necessary due to his misappropriation of Debtor funds to pay his legal fees.

The foregoing results in the disallowance of $151,060 and $99,554, or a total of $250.614, of the principal of secured Loans 1 through 5. The principal amount of those loans was only $247,940. Accordingly, the Court will disallow the entire secured claim, including all accrued interest and any charges.

### Loan Funds Used to Pay Other Debtor Expenses

The Court turns to the unsecured claim represented by Loans 6 through 10. Liu states he used the proceeds to pay legal fees and costs in the Specific Performance Litigation and for other legitimate expenses of the Debtor.

Although Liu did not have the authority to make these borrowings on behalf of the Debtor, the loans might be allowable under a ratification theory. To the extent Liu or Ms. Wang can show the funds were used for legitimate purposes that enhanced the value of the Debtor's real property or allowed the Debtor to maintain operations, the Debtor may have accepted the benefits of these loans. *See Shapiro v. Greenfield*, 764 A.2d 270, 276–77 (Md. Ct. Spec. App. 2000) ("corporation and the shareholders may secure major benefits from a transaction despite the presence of a director's conflicting interest"). Liu and Ms. Wang must show at trial "the inherent fairness and good faith of the challenged transaction" under a "heightened" standard of review. *In re Harford Sands Inc.*, 372 F.3d at 641. The resolution of the unsecured loans will await trial on the issue of whether the Debtor realized a benefit from these loans.

### Conclusion

From November 17, 2017 through March 20, 2018, Liu and/or Ms. Wang made Loans 1 through 5 to the Debtor in the amount of $247,940 secured by the two deeds of trust. Liu was

not authorized to make the loans on behalf of the Debtor. Further, Liu used $151,060 to pay legal fees and costs for the Specific Performance Litigation for which he, not the Debtor, personally benefitted. The Court will disallow the $151,060 of the proceeds from Loans 1 through 5 that Liu used to pay legal fees and costs in the Specific Performance Litigation, as well as any accrued interest and other charges for that portion of the secured loans.

From December 2016, when the Specific Performance Litigation began, until Liu began borrowing from himself and/or Ms. Wang in November 2017, Liu paid $99,554 to Mr. Chen from the Debtor's bank account for representing Liu in that case. In doing so, Liu misappropriated the Debtor's assets to his benefit. The Court will disallow $99,554 of the proceeds from Loans 1 through 5, secured by the two deeds of trust, because Liu's borrowing of that amount was unauthorized and was necessary only due to his misappropriation of the Debtor's funds to pay his legal fees.

Accordingly, the Court grants partial summary judgment to the Owner Group and will disallow the entire secured claim represented by Loans 1 through 5. The Court will set for trial the determination of whether the Debtor implicitly ratified the remaining loans made by Ms. Wang by retaining the benefit, if any, the loans provided.

cc:     Debtor
        Debtor's Counsel
        Movant – Owner Group
        Counsel for the Movant
        Respondent – Yanping Wang
        Counsel for Respondent
        Chapter 11 Trustee
        Counsel for Chapter 11 Trustee

**END OF MEMORANDUM OF DECISION**